Good morning. We don't need all this time to cover all these. I mean, the issues are pretty narrow, so. I would like to reserve a little bit of rebuttal. That's fine, but I mean, when setting the cases, we gave them, we treated them separately and gave each case 15 minutes. I don't think we needed to go through this for a half hour, so. If you let me know, I'll start with the first one, 56014, and if you want to cut me off, let me know and I'll move to the next one. Welcome to California. Thank you. Good to be here. The first appeal really involves the legal authority of a bankruptcy court to involve a subsidiary settlement. Routinely, you're going to have a state that has a subsidiary, and this is a perfect opportunity for the Ninth Circuit to really address that issue. When Winstar addressed it in a district district, you simply do not have jurisdiction in your bankruptcy court to involve yourself in subsidiary settlements. The reason being is that those are really not assets of your estate. The trustee obviously has to marshal the assets. In this particular case, Angus was a wholly owned subsidiary. Its stock certainly was a valuable asset, and that's the second appeal. But Angus had litigation pending for years. This was one of several cases it was involved in, and the trustee... You're talking about the state court litigation. State court litigation. We call this the... Between all those parties, the XTO litigation. The XTO litigation. We call this the setup settlement. This really is related to the second appeal because the outcome of this settlement positions Elysium to then buy this stock as a sole bidder. But all the bankruptcy court judge did here was just to prove the authority of the trustee to exercise the voting authority under the shares... That circumvents the rules. ...that the debtor had in Angus. I recognize that, but that circumvents the rules. If this was a normal bankruptcy 1919 settlement, typical estate resolution where the debtor in the estate is settling litigation, there's all kinds of protections for the creditors. My client, Palladino, filed the petitioning creditor's claim to open up this involuntary and has a vested interest in making sure that if there's going to be a settlement of the debtor's claims, you follow the 1919 criteria. You look predominantly at the benefits to the estate. This was an aberration because you have a subsidiary litigation. You have Angus versus XTO in a superior court involving non-debtors. So there's no precedent. There's no rules. A bankruptcy court can't just simply step in for a comfort order. This was really just a request for the non-debtor litigants, the subsidiary and then the BG parties, all non-debtors. No court proceeding here. This is a state litigation. Well, what did the trustee ask for? As I understand it, the trustee asked to vote the estate's shares. Well, no, I actually asked for an alternative. And so the bankruptcy court in its court proceedings authority have the authority to make an order approving the use of property. So why doesn't that approval for the trustee to vote the estate's shares fall within that provision? Because it's not voting the stock of the estate for a lawful purpose. This is a Delaware corporation. You don't vote your shares as a stockholder for your directors to approve your officers to settle litigation. That's not something that shareholders involve themselves in. They go to annual meetings and they appoint directors, which this trustee did. The directors then appoint officers, which these directors did. The officers then involve themselves in daily activities of the subsidiary. I'm not sure I'm following your argument completely. So the parties to the XTO litigation, when they reached their settlement, they knew that the owner of Angus was in bankruptcy and that Angus was a substantial asset of the bankruptcy estate. Maybe they knew that. Sure they knew it. They just wanted to make sure that the settlement would fall within the approval of the bankruptcy court essentially. I don't see why under the statutory provisions that are in play here, Judge Wynn alluded to, it seems like the bankruptcy court's authority to do what it did. 363B1 does not provide the bankruptcy court that authority. There is no jurisdiction. You may not step into the affairs of a subsidiary. There has to be some precedent. I mean, there has to be a case somewhere, someplace. I mean, this can't be the first case of impression where the Ninth Circuit looks at this and says that's absolutely correct. Is it your position that the stock is not property of the estate? It's our position that you can't vote stock for a subsidiary who's settling a non-core proceeding. Sure, the stock is an asset of the estate, and yes, there's inherent authority as a shareholder to do certain rights with your stock, particularly if you're the sole shareholder. It's common knowledge in the business community that what you do as sole shareholder is you appoint directors, and they appoint officers, and they run the business. The entire purpose of the 959 section of the code that we cite is that when you as a trustee cross that boundary and you begin to operate the business of the subsidiary, it's not an asset of the estate now because you've stepped into governing role of the corporate structure. You're no longer functioning as a shareholder whose right is to appoint directors and be distant except for in extreme circumstances. You've stepped into day-to-day management. You're governing the activities of the subsidiary. You no longer have the right to do that because the bankruptcy rules require that if you're going to settle litigation involving the estate, not the subsidiary, you must go through the 9019 analysis. The bankruptcy judge commented on that and then went into a 9019 analysis. That should disturb you because if it were true that what the bankruptcy judge was saying is that, look, why are you here? You have directors and officers. I can't approve a subsidiary settlement, his exact words. I don't have jurisdiction to do that. He should have stopped. He can't approve. It was up to the superior court judge to approve that settlement between the parties. No, no, the superior court judge had nothing to do with the settlement. These parties privately settled and filed a dismissal. Superior court judge. Well, I mean, the state court litigation was independent. Sure it was, and that's the whole point is that it's independent, and therefore – And this bankruptcy judge couldn't step into the role of a superior court judge. I mean, the whole thing was different. The parties to that settlement just wanted to make sure that everything was going to fall into place. That's all it was. Absolutely. Lawyers and parties – As Judge Nguyen said, this is a core proceeding. There's no possibility, there's not a single precedent, Your Honor, that there is a core proceeding for subsidiary litigation. That reverses Winstar. There's not a single case – Can we just assume that this was within the jurisdiction for purposes of – If it was within the jurisdiction, then it's reversible for this reason. 1919, so let's just forget for a moment that this is a subsidiary litigation and just equate it to the litigation of South Coast Oil, the debtor. So let's call it BG versus South Coast now, just to put it in context. And the court, therefore, absolutely under 363B1, could allow the trustee to vote as stock, and then you move to the bankruptcy rules. And every litigator, every counsel knows those rules by heart. It's 1919, and you go through the four steps of 1919, and the number one criteria of a settlement under 1919 is the trustee must prove the settlement benefits the estate. So the gravamen of the complaint here, of the appeal, is that the settlement not only did not benefit the estate, it raised no money, produced nothing beneficial to the estate, it gutted the estate. The number one quote of the case is at the record at ER 41. That's the Lieberman Declaration, a 30-year oil and gas expert. His quote is, no buyer ever would buy into the current partnership situation for any price whatsoever, meaning that the partnership was created by that settlement. It placed the Elysium parties in a 50-50 working interest relationship now with the Angus people. Right, and Angus also got, what was it, $1.2 million? Angus received a third of what was on the books owed by Elysium. That was a pretense. The $1.6 million wasn't to the estate of South Coast. It was a shifting on the books to the subsidiary. I don't really want to argue with you, but it seemed to me that Angus did receive a significant benefit here. It didn't have any significant benefit to the estate of South Coast. Again, the whole Winstar decision is that even if— The biggest asset that the debtor had was Angus, correct? The biggest asset that the debtor was selling at this time was the stock of Angus. There's a set of town lot leases that are on the books and the record in this case that they have two assets, but this was a significant one. But the whole point of Winstar's decision, the entire analysis, is that if every bankruptcy estate could drag in because there's a benefit to the subsidiary, the point you just made, if it were true, it's not here, but if it were, that every time the subsidiary's benefit, then you try to run a balance sheet formula and say, well, maybe this settlement increased the stock value through some intangible speculation. Can you address mootness for a moment? Mootness is not a— What it is you want us to do at this point, because the settlement has been executed, the state court litigation's done, and I'm assuming settlement funds have been dispersed. So what sort of relief are you seeking for at this point? The first item of relief is an analysis of whether or not this was an order outside the jurisdiction of the bankruptcy court. And if there's no jurisdiction, mootness doesn't play. You find there's no jurisdiction. Now, here it actually has— Basically, you're seeking now to undo it all. Well, you have— A lack of jurisdiction by the bankruptcy court to— You have the very problem that this creates for this appeal. On the one hand, this was a superior court case. So in the superior court, now you've got the Fourth District Division III and I guess the California Supreme Court system and the state system. By virtue of finding that the bankruptcy court had no jurisdiction to enter into an approval of this settlement, a comfort order, then the remedies— Right, that's what I'm getting to shorthand here. The state court litigation's done. Now you want us to say that the bankruptcy court had no jurisdiction, undo the settlement, go back to state court, presumably then reinstate the state court litigation? I'm not clear on exactly what remedy you're seeking at this point and why the case has not moved. I apologize if I didn't make it clear. I don't think you can order the state court to do anything, nor is it in front of you, nor is there any possible way that a federal judge under any concept of federal appellate court is going to reverse a state court resolution. That's going to be within the state court system. However, that was an issue that existed before they went to the bankruptcy court. They went to a secondary source. They went to a different jurisdiction to get a comfort blessing of a state court settlement. So the remedy you want us to do is to direct the parties to withdraw the notice of dismissal? No, I think what I want the court to do is to find that the bankruptcy court exceeded its jurisdiction and could not have in any manner approved that settlement. The benefit to this appeal, the reason that we're seeking that, is not in a vacuum, and it's not to try to go in and bother this court with what may or may not happen in the state supreme court where it would be a court of appeal through a writ process on that proceeding. It's to then tie it into the next appeal, which is, okay, now that we know that the original settlement was not lawful for the bankruptcy court to approve, whether it would have gone forward or not. It goes back to the question of whether the bankruptcy court approved the settlement. I don't think we can say the bankruptcy court shouldn't have approved the settlement. The best that you can hope for is some kind of a ruling that the bankruptcy court acted beyond its authority when it authorized the trustee to vote the shares. It is self-evident in the document itself that if the bankruptcy court had not blessed this, illegally blessed it, the parties wouldn't have settled. Their own agreement states that. It was a prerequisite. It was a conditioned precedent. So whether that unwinds it by virtue of their contract, whether or not one party or the other who made this a conditioned precedent now has a legal remedy to unwind it, I suppose that's a contract issue of law. They're going to have to debate that among themselves. But this panel is looking at the rules in the Ninth Circuit and saying bankruptcy courts have to draw a line. This case appears to be clearly distinct from the other case. On this case, you've got a little less than two minutes. Would you like to say some rebuttal for this case? I would. All right. Let's hear from the other side. May it please the Court, Steve Katzman on behalf of the appellees, with the exception of the trustee and the trustee ceding her time to me on this presentation, but she's going to take the lead on the sale. Mr. Mahaffey, or the appellant's counsel, has misstated. I think Judge Nguyen is correct that mootness is at play here, and I think that's a threshold issue, but I have to address the merits because Mr. opposing counsel has misstated the law and has misstated the facts. First, what did we go into the court to ask for? We asked the court not to bless this. If you look at the evidence and it's in the agreement itself, we asked the court for a ruling that either the trustee go to the court and ask the court to determine whether it's necessary to seek a court ruling, and if it is, have the trustee use the stock to ratify the actions of the directors. We didn't go and ask for that to happen automatically. We said, ask the court. See if the court thinks we need to come to the court for this ruling. The court decided it is correct within the purview of 363B to authorize the trustee to use the stock to vote to approve the settlement, which did bring $1.6 million to Angus, which resolved litigation that had been going on and cleared the way for a sale of the assets. So why was it actually necessary to have that degree of comfort? Transparency. There was litigation going on for years on an OSC that finally resolved favorably for my client. My client didn't want to do anything that was untoward and wanted to make sure that everything that it was doing was transparent and gave the other side the ability to contest it, which obviously they did. Query, what would have happened if we had not gone to the court? They would have used that against us to say, you settled this deal without seeking court approval. The fact is that we wanted transparency. And by the way... But the debtor really actually wasn't party to the settlement. No, but this is not uncommon for a debtor to seek court approval to use an estate asset for a particular purpose. And in fact, what I find particularly ironic is that there is precedent for this. And it's precedent in the Ninth Circuit. And it was actually cited, or I should say, miscited by the other side in the Milton decision. If you look at the Milton decision, it's the exact same facts. It was the trustee seeking court approval to use the stock to authorize the settlement of a wholly owned subsidiary. Well, it was an individual, slightly different. It wasn't a corporation. It was an individual holding it. And it's in our briefs, and we point that out. So not only is it factually incorrect to state that we were seeking court ratification. We were just bringing it to the court to determine whether ratification was necessary or not. But it's also precedent setting. There is precedent in this circuit for that proposition. Does the appellant have a remedy against anybody if it believes that it was harmed by the inadequacy of the settlement? I don't believe the appellant has a remedy. I believe, well, that goes for a variety of reasons. I think, number one, there is mootness here. The appellant stood on their rights. Well, tell me about that because it seems to me it is moot. I mean, they could have tried to challenge this before it all, before it got undone, before it got done, excuse me. Right. And that goes to the mootness argument. They never sought a stay in the district court. They never actually, what they did do were things that were highly improper, and the record reflects that, to try to unwind the settlement. But they never actually sought the proper remedy, which was to seek a stay. And in reliance of that order and in reliance of what the terms of that settlement were as clear as day, that the effective date was not the date of a final order. The effective date was the date the court enters the order, that the case was going to be dismissed, the state court litigation was going to be dismissed with prejudice, and money was going to be exchanged. And that all happened. So how do you unwind? And by the way, there's case law in this circuit for that precedent, too. The Turner decision, it's a BAP decision cited in our papers, states that the court lacks jurisdiction to unwind a dismissal with prejudice of a state court lawsuit. So the reality is that mootness comes into play, too, because they sat on their rights. But even if mootness did come into play, and even if there was an ability to challenge what we sought and obtained, I'm not sure. The remedies are so wildly speculative that this court cannot possibly entertain them. I mean, things like, he mentions 959. He wants to go after the trustee and sue the trustee for breaching the fiduciary duties. There's not a scintilla of evidence to support that proposition. To unwind a transaction that at the time was between two separate parties, and it's frankly still two separate parties. It's just by happenstance that we later acquired the asset of angst. But there was money that changed hands, and that money was spent. That money was spent on vendors. It was things that allowed this case to successfully be on the right track. And moreover, there are parties to this settlement that there aren't before this court. XTO. XTO was part of the state court litigation. Well, let me ask you this. I'm not suggesting it would be successful, because you obviously would oppose it. If the challenge really is the trustee's action, isn't the remedy to file a new action against the trustee? I mean, it would seem to me that would be, if that is really why we're not being asked to undo the state court litigation, and I'm not asking you in any way to concede that that would be a meritorious piece of litigation, but wouldn't the remedy be just to sue the trustee? I think the court is, I think Judge Matsu, you're correct. I think that would be the remedy. I would think that, you know, I don't represent the trustee. I think that would be a highly specious claim. I'm not asking you. I'm not asking you. But that's, I think the court just. But if that's really where we are, if that's what this is all about, that the trustee, you know, violated corporate governance rules and approved a settlement that, when it got the court to approve, you know, it approved, it approved the settlement improperly, the remedy would be against the trustee. That's right, Your Honor. And there's another point I'd like to make here, and it's, this is something that appellant's client actually sought in the same case in 2009 and obtained. And it was a comfort, the way he calls it, there was an agreement between Angus. It's kind of a nice term, comfort order. Everyone likes a little comfort now and then. But I don't think there's anything wrong with seeking transparency and having a court ruling either saying, yes, this is an appropriate use of the stock, or B, no, this isn't appropriate. What are you doing here? And that's what we asked for. We didn't come in and say, ratify this. We said, Judge, in the interest of transparency, we want you to know this. We want the parties to know this is what's going on. And how you could be punished for that is beyond my comprehension. But what's ironic here, it's really ironic. Again, so I understand your view of transparency. If somebody disagreed with that, they should have filed a motion to stay after it was approved. If they thought that the settlement should be stopped, they should have, in the very least, just like a sale motion, there should have been a stay, sought. They sat on their rights. And the precedent that would be created if this court somehow would even consider reversing Judge Albert's very thought-out ruling. And by the way, I encourage the court to look at the ruling because it was a very critical analysis. And he actually, not that 9019 even applies, but even if it did, he did go through the 9019 analysis. But the fact is, is that he lived with this case for years. He knew this case. He knew it from their order to show cause, which was a parallel to the state court litigation, the same allegations. He lived with this for years. This judge was uniquely positioned to examine the facts, weigh it, and determine whether the business judgment of the trustee was correct. And what I wanted to point out was that the exact same thing. They sought court approval of an order in 2009, which they actually, and I think it's mistakenly, cite in their opening brief at page 9 and criticize it. I think they meant to criticize my order, and they cited it to their own order. But the point is that they themselves have actually gone in court and sought the same relief that we sought. So the fact of the matter is that it is moot. The fact of the matter is that the court had the authority to do this. The fact of the matter is that there's precedent in this circuit to support that. And the fact of the matter is that there was transparency, and we asked for alternative relief, and that's all appropriate. What's the status of the bankruptcy proceeding today? Well, I would defer to the trustees' council, but it's my understanding that it's on process for a successful resolution and contemplated a significant distribution of creditors. The fact of the matter— The Palladino Trust is not the only creditor, I gather. No, and I think the trustee can— But they've taken an active role in this particular matter, needless to say. Well, yeah, active would be an understatement, but I think that what's interesting— Well, are any other creditors objecting to any of this? If the court had three or four hours, I could tell you lots of stories about lots of creditors in this case. You can write a book about— I don't understand where this case is today. In spite of all this, I believe it's on a very successful track, and it's thanks to the trustees' efforts to do what it could to enhance and market the asset. And I would point out one other thing about mootness. It just comes to my mind is that not only did they sit on their rights, but they got money. They got money out of the state. Mr. Mahaffey himself applied for over $600,000 from the sale proceeds and took that and got over $100,000. His client, BG, got $2.2 million. So it's perhaps the most egregious example of equitable mootness you can find, where not only do you sit on your rights, but you take actions to render it moot. So when you look at that collectively, there's just no basis for him to be seeking the relief that he's seeking. And frankly, even if he— And what relief is that? I'm not really sure. I'm not really sure. I think it's what the court has just said. It's to go out and undo everything and sue everybody, which, as you pointed out, Judge, if he wants to sue somebody, he can go sue anyone he wants. That's his right in this country. Well, we're subject to Rule 11. I certainly hope so, Your Honor. Okay. Thank you. I believe on this— Two minutes left. Oh, 1.46 seconds. The remedy is to find that there's no authority under 363b.1 for the trustee to vote his stock as directors on a non-debtor settlement. At the record, at ER 558 through 60, 78 through 89, we put forward— So what happens—this is not just a matter of theory—what happens as a result of the holding? Two things. This is integrated. I'll move right into, when my time is up, into the second appeal. If this was the stand-alone event, if we didn't have the next event, which was that the very party who settles with this comfort order, illegally getting it obtained, then buys the stock as the sole bidder, I wouldn't be here, neither would the Pallavino Trust, representing a body of creditors. This is the petitioning creditor who formed the involuntary. This is not in a vacuum, though. This is the reason Elysium became the sole bidder. It's the reason I cited you to the declaration of the expert, because this settlement created in the estate the absolute certainty that Elysium would be the sole buyer. There's no third parties. Remember, this is an oil and gas set of leases. They owned 50% of the working interest to begin with. Pre-settlement, the whole lawsuit against them in the state court was to set aside that ownership and said they had obtained it illegally. The bankruptcy court had nothing to do with that state court litigation, could not in any manner involve it, and therefore this wasn't the traditional stay. Appellant knew how to obtain an emergency stay. The next appeal demonstrates the Herculean efforts. There was no jurisdiction. You couldn't get the All Writs Act to apply a mandatory writ by a federal bankruptcy court to stay a state court civil litigation. It doesn't exist. There's no basis for me to go into a federal system and say, hey, next door there's a state court litigation of two non-debtors that are taking place. The aberration was that the two non-debtors litigation was presented for any reason. And the motion, I'll close on this, the motion was in the alternative. It said either approve the trustee voted to stop or confirm that it's within the purview of the directors. The motion either had to be denied because we're not in the business of giving you comfort to approve subsidiary or grant the alternative. Clearly, a state court settlement is within the purview of the directors. Okay, enough on that one. Let's move to the second case. So this is, just for the record, you state your appearance on this. This is Palladino v. E&B Natural Resources. Go ahead. Thank you, Your Honors. This is the appeal that focuses on the inexplicable event where you have two fundamental flaws. The first one is the stay, since we're talking about the stay procedure. 6004H unequivocally with no precedent that they've decided on the appellee's side does not allow the shortening of a 14-day window. For the very reason that the courts inquired as to the activity of the stay, 6004H mandates that you have 14 days in which to seek the emergency stay, which we did and which the district court granted. So Judge Selma grants our emergency stay relief, but literally, simultaneously, within the 14 days. Was there diligence? When did you attempt to seek that stay? Immediately. I mean, you have the practicalities that under 14 days you have all of the marshaling of an evidence. You've got a multiple thousand-page record. But within the 14 days, within 8 days as I recall, we were there. Because the 10th day, or maybe it was 12 days, because the 12th day was a Friday, so it would have been 11 days we filed it. It went to the BAP. Then they circumvented that, which they have a right to do, and sent it to the district court. So we lost that day or two days while they rewrited the file. So we were there by day 10 or 11 at the latest. Now, the settlement was set to be approved on Sunday. That was the normal statutory time frame. They moved it to Friday.  that he's issued a stay. They move up through a private arrangement, modify the agreement, and the money changes hands, and they come in with a declaration that says, well, we've closed this auction. Now, that can't be allowed. There's no possible precedent to shorten that 6,004-H session because that specific code is to allow. And this was a complicated issue. The first appeal is because of the record of the settlement that positions the 50-50 owner in an inside position. The reason an auction cannot occur with an insider without great scrutiny is because, by definition, you're prohibiting the body of bidders. There was a $25 million value placed by the only evidence in this record by Steve Lieberman, who had spent two years, according to his declaration. You can read the entirety of his declaration at ER 523. He goes through 40 paragraphs of having set forth in 30 years of experience how this was a sham. Let me interpret that. I have a tough time understanding all this. If you have a remedy, you're not trying to set aside the settlement. If you have a remedy, isn't it that the trustee entered into an inadequate settlement, and so that, therefore, your remedy is against the trustee? I mean, isn't that what you're really looking at? What you want is a ruling from this court that would help you in that claim by saying that the trustee had no right to ask the bankruptcy court to authorize the settlement. Appeal 1 deals with the settlement. Yes, I think the court should find that it didn't have jurisdiction, but I'm now on to Appeal 2. There was no settlement. This was a 363B option, and they are a bit confusing. But, again, the settlement occurs. It places Elysium now as the positioned party to come in and bid by itself. But still, whatever, isn't what you're trying to do is to say this whole transaction was unauthorized. The trustee breached its duty to the estate by entering into an inadequate settlement. And, finally, what your remedy would be, if any, would be against the trustee. Well, I think we're two steps removed, Your Honor. I do think that the district court, I think you remand this. Now, I mean, you have the de novo review ability to obviously just reach the ultimate issue. If the option under 363M was involving a non-good faith bidder, therefore, in this case, there's replete evidence it was bad faith. You could just make that claim. Well, the district court, the bankruptcy judge found that there was a good faith. The bankruptcy judge did not find that there was good faith based on the evidence. The bankruptcy judge rubber-stamped an order that had it in it. Well, I mean, that's a pretty serious charge to make against the bankruptcy judge. It is based on this record. I read the transcript of the hearing and his order, his findings. He found it was in good faith. The bankruptcy judge was presented the issue of whether or not there could be an emergency stay. That was the first issue that was boilerplate into the court. And he denied it. He just simply approved an order that had a sort of order. I thought at the hearing you asked him for a stay. I did. And he said no. He said no. Denied. And so automatically. It seems to me, as Judge Nguyen said, that puts you on clear notice that you had better get to either the BAP or to the district court. We did. I mean, you can't change. When did you file your notice of appeal? Immediately. The next day? I don't know. Within 24 to 48 hours we were preparing the briefs and by day 10 we had Judge Selma granting it and then reversing himself. So the question of how quickly can a human being take this volume of a record and present it to the BAP that then goes to the district judge is the very essence of 6004. Look, the legislature has long picked 14 days. They could have picked 21. They could have picked one. They passed a rule for this very purpose. 363 auctions, which this is a very textbook example, are very complicated. This was an entire group of facilities, oil and gas leases, and assets that were the grovement of an oil company in bankruptcy subsidiary. Only with the 14-day window is it humanly possible to get in front of a district judge and have that judge have the reasonable opportunity. I mean, to Judge Selma's credit, with the absolute volume that we brought to him not on day 13, he granted the stay. Well, district judges have authority to do a lot of things. They could have granted just a temporary stay while he considered your motion to, you know, while he determined whether to grant a longer stay pending the bill. There's different things that he could have done. I think what he said, though, in the record was that there were funds in the estate and therefore other remedies existed. But then he found it was jurisdictionally moot, and that was the error. It wasn't jurisdictionally moot at all. We had perfected all rights of the issue of whether or not the auction was, in fact, a good-faith or bad-faith buyer in the auction. So is it your position that you had an extra two days to get the stay? Well, absolutely. You had at least until the 14th day for the court. The court rendered the—he reversed himself on the stay because they had filed a declaration that says, remove monies, change hands. Now, how disingenuous is it that if you have 14 days within which the opposing party who vehemently opposed the auction, vehemently opposed the setup to the auction, which was the settlement, brought in experts' testimony, and you had a record of multiple creditors, not just this one, multiple creditors asking for more time, recognizing this is the whole dance of this estate. It's going to be spent on this auction. And then they shorten it two days. And had they not, Judge Selma had ruled. He was going to look at this, slow it down a little bit, and see whether or not the auction, in fact, was done by an insider. But then his ruling was, look, I found out now that they've changed hands. The money's been wired. The $10 million's been wired. Well, wait a second. The $10 million's in the trustee's account. Getting to the merits for a moment, you're on appeal now. So you have the very difficult burden of demonstrating that the lower court's finding that Elysium was, in fact, a good faith purchaser, that that finding was clearly erroneous because that's a factual finding that we've got to review with deference. So what's your best evidence? The declaration. I mean, this is a 40-paragraph. Lieberman's declaration is the best evidence demonstrating clear error in your view? Absolutely, because that declaration sets forth from an expert in the business at the time of the auction. You'll never see a case where you have a single bidder and the only evidence in the record is a leading industry broker, who's also a petroleum engineer, who also evaluated this plant from its beginning, that says this was a sham. They had three conditions, Your Honor. One was you had to put up $1 million up front. Two, you had to pay $7,500 just to look at the due diligence room. And three, they had a confidentiality agreement that no person signed until it was completely revised. He said he laughed when he met with his buyers from China about how this was one-sided. You don't treat a broker in the industry when you're a trustee and you're selling an auction with this sort of impunity, with some sort of a hatred or hostility, but yet he declares that he was basically barred from getting into the diligence room until six days. If you look at his final signature on page 532, he says who knows what I'll get in the next six days because there's 14,000 pages that are supposed to be uploaded. And they did that. Six days before this, they data-dumped on all the creditors to look at every aspect. Can you imagine the amount of time it would take to buy an oil and gas facility? This was a 25-year working facility. It's an oil and gas operation. It's being sold to the oil industry. There was no urgency here. The $10 million could have easily stayed in the trustee's account why Judge Selma looked at this issue and determined whether or not there was clear error. If, in fact, this was a collusion and a sham. If you look at these 40 paragraphs and say this is outrageous. Nobody sets up an auction where they bar the public from bidding. And that's effectively what they did. And, of course, the proof's in the pudding. I'm still confused about the remedy. You say that what this court should do is to remand to the bankruptcy judge on a finding of good faith when the bankruptcy court has already found good faith? No, you have two specific alternative remedies. This is here because Judge Selma found after granting the stay that it was equitably moot. That's a de novo review. You reverse that. Say it wasn't equitably moot. The four-part test has multiple variables here. Because there are remedies then, there are remedies now. This estate is open. There's been no plan of reorganization finalized or approved. Notwithstanding the speculation, there's nothing that would prohibit Judge Selma from reversing. If you reverse the equitable mootness, then he reaches the merits. and finds that the 363M standard was violated and that there was clear error in finding that there was a good faith buyer, then there are remedies that are available because the estate's open. The buyer who bought this was already a 50-50 owner. This is not a third party. This isn't somebody coming in and buying this asset. This is a half owner who owns 50% of the working interest in the oil and gas leases who essentially did an accounting transfer on the balance sheet. They went from 50 to 100. They go back to 50. The idea that you would have a 959 suit against the trustee... What would happen to the money that was paid? The money that was paid by the trustee that left the estate? I guess he'd better answer to the bankruptcy court. He knew the Ninth Circuit was going to be reviewing this, and he knew the district court was going to be reviewing this. So that is where, if the bankruptcy court, after remand, and it's found that this was not a good faith purchaser, and therefore there was collusion, you cannot, as a trustee, disperse those funds. He should have frozen them. There's just one clarification. So under Rule 6004H, that imposes a 14-day stay that the bankruptcy court can waive. And that's what happened here, correct? It is error for a bankruptcy court... But isn't that what happened here? That's what happened here. And you asked at the hearing for the bankruptcy judge to stay at pending appeal, and he said no. He granted it the exception to this rule. And so you knew, you knew you had to be in front of the BAP or in front of the district court, like, the next day. You know, I understand that these are complicated matters and whatnot, but we get matters here all the time. And I'm sure in the Fourth Circuit, too, they get the same stuff. I mean, immediately, parties go to the circuit or to the court. And that's, you know, it doesn't beg the question. It does. The question that's begged is what is your authority to a bankruptcy judge that waived 6004H without a basis? And the answer is reverse him. You cannot waive 6004H because somebody puts it in an order. Well, the point is that the bankruptcy judge made that discretionary call. And if you didn't agree with it, you could have rushed to court the very next day. I think it would be absolutely true if Judge Selna had not granted the stay. In other words, if it were true that we didn't get to him quick enough, and you were looking at this and balancing the interest of whether or not error occurred by the bankruptcy judge in waiving 6004H, which he had discretion to do, although no precedent, because the precedent says you have to have factual reasons. But we have a stay, and then the stay is lifted within the next four hours. That's the unique fact here, which proves we got to them quick enough. He did look at it. He read it, and he granted the stay. How could you then go from reversing that stay merely because they cram a settlement through and exchange money and rush the two days in advance? I think that's our best case, is there was a stay. We got one. We were fast enough. Time's up. Thank you. May it please the Court. Catherine Castaldi, appearing on behalf of the appellee. James J. Joseph, the Chapter 11 trustee for the bankruptcy estate of South Coast Royal Corporation. Your Honors, I was going to start with 6004H, but the Court has addressed the fact that as a practical matter, 6004H specifically provides for a waiver by the bankruptcy court if it so orders. It's right within the rule, the procedural rule. And in fact, the request that 6004H be waived was part of the sale motion that was filed with the bankruptcy court and was, in fact, granted without objection from Mr. Mahaffey until such time as he made the request after the Court ruled that a stay be issued. So with respect to that issue, I appreciate the Court's clarification on that. With respect to the diligence with which Mr. Mahaffey pursued, and I will excuse me for calling out Mr. Mahaffey, which appellants pursued the stay, they did not file their notice of appeal not on February 18th, not on February 19th or February 20th. They filed it on February 27th. So it wasn't filed within a few days of when the case, of when the order was rendered on February 17th. But Judge Selna did grant it. What Judge Selna did, Your Honor, was grant a stay, a temporary stay, for the purpose of allowing the opposing parties, I'm sorry, Appellees James Joseph and also Elysium and E&B, to come before the Court with their opposition as to why such stay should not issue. That is the limited relief that Judge Selna granted to the appellants. Unfortunately, it was granted after the sale had concluded. 363M provides... So the order by Judge Selna was entered after the sale had been completed? The sale had concluded. That's correct, Your Honor. So it wasn't on Friday that he issued it and you all hurried it up and settled on Sunday. My understanding is the wire had left on Thursday, transferring funds from Elysium's account into the account of the estate, the trustee's account. We had set Friday morning as the deadline, as the date in which we were going to be closing the sale. We held a closing at the offices of Angus and later found out that Judge Selna had issued a stay. Judge Selna, in his order ultimately dismissing the case, acknowledges that the sale had closed at the time that the stay was issued. It had already closed. It had already closed. Right, it did. Under 363M, where the Congress has, as a matter of public policy, has a safe harbor for bankruptcy sales, just to prevent the kind of nonsense that's going on in this particular instance. The issue is where a movement and the purchaser come before the court, request a determination of a good faith finding pursuant to 363M, provide the court with evidence as to the basis for that good faith finding, and in fact the court relies on that evidence in issuing such finding, and in this case also assessed the declaration of Mr. Lieberman, and the court makes reference to that in his tentative ruling, and also in the findings and conclusions that were issued in support of the sale order. The court found that Mr. Lieberman's declaration was not credible. On the other side, he did find credible the declarations of James Joseph and the declaration of Steve Layton, the buyer's representative, and he concluded and found within his sale order, there was an explicit finding that the sale was negotiated and proposed in good faith, and therefore entitled to the protections of 363M. There was a finding that the SBA was the product of extensive, substantial discussions and negotiations between the parties that occurred over the span of several months. The negotiations and conduct of the parties were at all times in good faith. That was found by Judge Albert. The trustee was free to deal with third parties throughout the negotiations and sale process. At no time did Elysium, Angus, or the trustee collude with one another to disenfranchise other prospective bidders, engage in any process to allow Elysium to secure the Angus stock for less than market value, or ensure that the trustee received anything other than the maximum value for the benefit of the estate. The bankruptcy judge wrote all of that? Yes, he did. Did he? He did. It's not just signing an order? No. These were specific findings that we asked for and that the court ruled on, and I think it's important to note as well that many of the issues that the appellants are complaining of today in terms of the way that the sale was conducted should not be before the court right now, and this is why. In September of 2011, the trustee bifurcated the way that this motion was done. So he moved the court for a bidding procedures order. It set forth all of the things that Mr. Mahaffey was just complaining about to this court. It set forth when the timing of the sale would be, what the advertising would be. It approved the $7,500 request for due diligence fee given the circumstances and the enormous effort that was undertaken in order to get those documents together and ready for parties to do their due diligence. All of those things were approved by the court, and while there were objections, there was no appeal of that order, and that was the order of the court under which we proceeded in the sale, and the trustee complied with all of the provisions of that bidding procedures order when he conducted the sale. The other thing that is of import here is that there were no parties, and this was also found by the bankruptcy court, that complied with the bidding procedures order. There was not one qualified bidder. Now, Mr. Lieberman, who submitted his declaration two days in advance of the sale order hearing, suggests that the reason for that is because nobody would purchase the asset, meaning the stock of Angus, when the stock of Angus really only entitled the purchaser to 50% of the Springfield unit facility. What Mr. Mahaffey has neglected to advise the court is that Angus always only had 50% of the Springfield unit facility. It was the operating interest holder of the Springfield unit facility, which was owned 50% by it and 50% by XTO at one time, and then subsequently through purchase by Elysium. So that fact was not altered by virtue of the settlement. That had always been the case. So always that's all the court had to sell, or rather that's all that the trustee had to sell was its 50% interest, its stock, which represented a 50% interest in the Springfield unit. Finally, I would make one final comment, and then I will cede the balance of my time to Mr. Katzman unless the court has questions. The issue as to why the trustee wanted to move forward with a sale closing was also put before the bankruptcy court, both in the bidding procedures motion and also in the sale motion, and the reason was this. The Angus facility was under a cease and desist operations order, a shutdown of its water injection permit by the Department of Oil, Gas, and Geothermal Resources for the state of California. That matter was on appeal, and there had been an administrative law hearing scheduled to occur on March 28 of 2012, so less than 27 days after the sale was purported to close. I believe that when, and Mr. Katzman can address this, but when Elysium requested a March 4 closing date originally, the reason for that was because they wanted time to go forward before DOGGR with their arguments as to why and their representatives present as to why that order should be lifted. On the other hand, were we not able to close a sale with Elysium, which by the way closed for a $10 million purchase price, we would have ended up in a situation where had DOGGR ruled against us, then we would not have had much to sell. So, Your Honor, with that, I will cede the balance of my time to Mr. Katzman unless the court has any questions. Just a few follow-ups. We parted with $10 million in good faith. We did that with findings of good faith. We relied on that in a commercial, reasonable manner. There's a reason why there was a sense of urgency, and by the way, Mr. Appellant's counsel misrepresents the record as it relates to that 1003 order. It's in our company sanctions motion that we've submitted in this matter. And by the way, we did do a sanctions motion in this matter. We did not do that lightly. I've never done that before before a court of appeals. But when you look at the misstatements and misrepresentations that are contained in the record by appellants, they are significant. They are, I would dare say, systematic. And, for example, one of the parties that's appealing here didn't even show up and file a notice of appeal at the district court. Didn't participate in the district court. Filed a notice of appeal in the Ninth Circuit, this joint venture. Wasn't at the lower court on the sale order. The sanctions motion has numerous citations to misrepresentations, and frankly, this hearing could point out that there were misrepresentations. 6004, as Judge Pius pointed out, does have unless otherwise ordered. It's not an absolute. And it was otherwise ordered. They did not immediately appeal, as appellant's counsel stated. They sat on their rights. We parted with $10 million. I'm just curious. What happened with the cease and desist order? The cease and desist order, I will tell you that eventually, I think that there has been, after extensive discussions with DOGGR, there has been, and I believe it's, I wasn't representing my client on that. That's okay. I thought they settled it. Eventually, there has been a resolution. But it required lots of negotiation. So I think I read that in one of the briefs. I recall that there had been some resolution. But the fact of the matter is it was an actively litigated issue that if Elysium had lost or it had been lost, the value of the stock would have been severely diminished. Not only that, to comply with that order, and I'm going from secondhand knowledge, I believe there were certain actions that had to be taken. South Coast was in bankruptcy. Angus didn't have the funding to deal with these issues. It was in a very dangerous position. It wasn't my call. It was the trustee's call on respect to that issue. The trustee and these parties were fully aware of that for many, many years that DOGGR had, that there had been this pending litigation. But we did part with $10 million. And a significant portion of that money went to Appellant's clients and to Appellant. And my client is not – there is no remedy here that this court can entail. And that is why 363M is there. And that's why the case law, which is so well settled, supports the proposition of the finality. And the sites and the legal arguments that are being made as to the Thorpe factors, they're just not applicable. There's case law directly. So the whole point here is that if we determine that the sale was in good faith, then under 363M, the case is over. Yes. I think that this is – the mootness – we've argued that alternatively. We've said that the matter is moot, but alternatively that if you look at the merits, the bankruptcy court had a complete record before it and made a very, very detailed analysis as to both whether this was in the best interest of the estate and in good faith. And something else that I think the court should know is this wasn't a rubber stamp. We submitted an order, actually, that had – fearing that we would be here on issues such as this because that's the nature of – the litigious nature of this matter. We asked for some very extensive findings, and if you read the transcript, Judge Albert pushed back on that and narrowed the scope of the findings to the set that finally was entered in the order. This was not a rubber stamp. This was a critical analysis. And by the way, at the hearing, if you look at the transcript, there isn't one other bidder that came forward, and that's what Judge Albert said, show me the money. Nobody else was willing to show the money. And there's a good reason. The Chinese didn't have time. The Chinese had plenty of time. I think that what – if there was a chilling factor here, it was the litigious nature at the lower court of the appellate. Nobody wanted to touch this. Well, that's why I say nothing about dependency of the cease and desist order litigation. The court – and I would leave the trustee to argue that more, but I believe that the court did consider that in its analysis. So there was exigent circumstances. There was significant sums, and even Mr. Lieberman's analysis, which talks about a illusory $25 million value, that's for the whole thing. We owned half of it, and it was found in the OSC, in the discharge OSC, that we did nothing wrong in acquiring our half interest. They only had a half interest. He may not – the appellants may not like that, but that's the reality. And $10 million for that half interest, as the court found, was by and far the best offer. Just – your time is up, but could I just clarify one thing for our sheet here? Ms. Castaldi represents Joseph, the trustee. Is that right? Yes. And you represent? I represent the purchaser, Elysium. Elysium. Okay. I just want to clarify on our sheet. I don't know if I have time, but one other point. Yesterday the bankruptcy court entered an order approving the settlement with Mr. Grayson. That was a related – we got notice of that settlement. You have notice of the settlement, which was contested as being speculative. The order has been entered that would – pursuant to the terms of this, once the order becomes final, the appellate period is run, there will be a statement being filed establishing that Mr. Grayson does not support – essentially doesn't support this appeal. Right. Okay. Thank you. Did he have any time? 18 seconds. That's all you got. 15 seconds. Well, I guess the main point is that the $10 million was paid for a $25 million asset. That's the Steve Lieberman Declaration by an insider who's acquired – Why isn't it for a $12.5 million asset? I'm sorry. Because the 50 percent interest was the entire basis of the first appeal that they obtained through the illegal settlement, and that was still available to contest except for them as the buyer. Any other party could have come in, paid full value, and set aside that interest. It was simply a title cloud. They didn't actually own 50 percent. That was the whole pretense. To own 50 percent, they had to have conveyance of valid leases. There were no valid leases. That was the entire premise of the first appeal. That's why it's so significant. With no lease validity, they'd all terminated years earlier. You own 50 percent of nothing. Angus had new leases. They were worth $25 million. This inside player came in, paid 50 cents on the dollar, and made out with the money that owes to these creditors. That was the value of the estate that's gone now. Okay. Thank you, counsel. We appreciate all the argument that we've heard on these two matters. It's very interesting, and they'll both be submitted at this time.
judges: Motz, Paez, Nguyen